IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

Mark N.,

Plaintiff,

vs.

FRANK BISIGNANO, Commissioner of Social Security,

Defendant.

**25-CV-00718**

**MEMORANDUM AND ORDER ON JUDICIAL REVIEW OF COMMISSIONER'S DENIAL OF BENEFITS**

Plaintiff Mark N.[1] seeks judicial review of the denial of his application for disability insurance benefits by Defendant Commissioner of the Social Security Administration. Filing 1 at 1. Mark N. has moved for an order reversing the Commissioner's decision. Filing 1 at 1. In response, the Commissioner filed a motion to affirm the Commissioner's final decision denying disability benefits. Filing 20. For the following reasons, the Court grants the Commissioner's motion to affirm and denies Mark N.'s motion to reverse.

## I. INTRODUCTION

### A. Procedural Background

Mark N. applied for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, on July 7, 2023. Filing 9-2 at 16 (Administrative Record (AR) 15). In a disability report created by attorney F. Anthony Mannella, Mark N.'s listed medical conditions included: epilepsy, shoulder pain, cystic fibrosis dysplasia in the left tibia, left leg hardware, a lesion on his temporal lobe allegedly causing seizures and memory loss, asthma, and hypothyroidism. Filing 9-6 at 7 (AR 264). Mark N. alleged an onset disability date of August 17, 2022. Filing 9-2 at 16 (AR

[1] The Court will refer to Plaintiff by first name and last initial to protect his privacy.

15). Mark N.'s claim was denied initially on March 22, 2024. Filing 9-2 at 16 (AR 15). His claim was denied upon reconsideration on June 13, 2024. Filing 9-2 at 16 (AR 15).

Mark N. filed a written request for a hearing on June 25, 2024, pursuant to 20 C.F.R. § 404.929 *et seq*. Filing 9-2 at 16 (AR 15). The Administrative Law Judge (ALJ) held a telephone hearing to review the denial of Mark N.'s application on November 4, 2024. Filing 9-2 at 16 (AR 15). On November 22, 2024, the ALJ issued a ruling in favor of the Commissioner. Filing 9-2 at 29 (AR 28). Mark N. requested a review of the ALJ's decision, and on October 14, 2025, the Appeals Council issued an order denying his request for review. Filing 9-2 at 2 (AR 1). Mark N. filed this action requesting that this case be reversed and remanded for further proceedings and seeking an award of costs and attorney's fees. Filing 1 at 1.

**B. Factual Background**

*1. The Claimant and His Alleged Disabilities*

Mark N. was thirty-four years old at the time of the alleged disability onset date, August 17, 2022, classifying him as a younger individual (age 18–49) pursuant to 20 C.F.R. § 404.1563 and 20 C.F.R. § 416.963. Filing 9-2 at 27 (AR 26). Mark N. is classified as having at least a high school education pursuant to 20 CFR 404.1564 and 416.964. Filing 9-2 at 27 (AR 26). The ALJ determined that Mark N. "has the following severe impairments: degenerative joint disease of the bilateral shoulders with residuals of surgery; residuals of tibia fracture surgery; epilepsy; anxiety disorder; and depressive disorder." Filing 9-2 at 19 (AR 18). The ALJ determined that the following impairments were non-severe: hardware in Mark N.'s left leg, a lesion on his temporal lobe causing seizures, memory loss, asthma, hypothyroidism, and cystic fibrosis dysplasia of the left tibia. Filing 9-2 at 19 (AR 18). The ALJ determined that Mark N. has not engaged in substantial gainful employment since August 17, 2022, the alleged onset date. Filing 9-2 at 18 (AR 17). In his

adult function report, Mark N. reported that he lived in a house with his family. Filing 9-6 at 27 (AR 284). However, at his hearing, he testified that he lived with a roommate. Filing 9-2 at 56 (AR 55).

Mark N. avers three general bases in support of his motion for an order to reverse the Commissioner's decision. First, Mark N. argues "the administrative law judge (ALJ) failed to either adopt or reject and explain his rejection of limitations offered by medical sources whose opinions he found persuasive." Filing 13 at 1. Second, he contends the "SSA [Social Security Administration] cannot rely upon EM-21065-REV to completely prohibit any consideration of certain parts of the DOT [Dictionary of Occupational Titles] such as reasoning level." Filing 13 at 1. Third, Mark N. maintains "the ALJ's residual functional capacity (RFC) finding is inconsistent with his own finding of severe mental impairments causing moderate limitations in concentration, persistence, or pace." Filing 13 at 1. This Court will provide a focused statement of the medical records and other evidence relevant to Mark N.'s challenges to the ALJ's decision.

2. *Medical Records and Evidence*

a. Treating Physicians' Opinions of Mark N.'s Symptoms

i. Seizures

Mark N. was seen at the Bryan Center West Campus emergency room on April 7, 2022, after suffering a seizure at work. Filing 10-1 at 144 (AR 484). McKenna Brugger, RN, wrote that "[Mark N.] reports having a seizure two months ago. States has been current on taking his keppra, but has not had a follow-up appointment with a neurologist 'in a few years.'" Filing 10-1 at 144 (AR 484).

On September 18, 2022, Mark N. visited the emergency department at Bryan Medical Center West Campus, where he was seen by Dr. Daniel Schiefelbein, MD. Filing 10-1 at 130 (AR

470). At this encounter, Mark N. stated that "he has been without his keppra for the past month or two." Filing 10-1 at 130 (AR 470). Mark N. went to the emergency department because

> he was on a motorized bicycle when he hit a curb and went over the handlebars. He presents in c-collar he is amnestic to the event sounds like he may be los[t] consciousness he is alert answering questions last [th]ing [he] remembers is being about 3 blocks away from work. He is complaining of facial pain and right shoulder pain.

Filing 10-1 at 130-31 (AR 470-71).

Dr. Samuel Braden, MD, reported that the CT scan Mark N. received on September 18, 2022, "demonstrate[d] unchanged hypoattenuation in the anterior left frontal lobe corresponding to lesion described on MRI brain 6/23/2017. This does not appear significantly changed in size compared to that exam taken [sic] into account differences in modality." Filing 10-1 at 191 (AR 531).

On April 9, 2023, Mark. N. went to the emergency room at CHI Health St. Elizabeth and saw Oscar Lucas, PAC, after having two seizures that day. Filing 10-1 at 282-83 (AR 622-23). Lucas noted, "Patient is on Keppra and has been compliant with antiseizure medication." Filing 10-1 at 283 (AR 623). This note was then contradicted as Lucas wrote, "Patient ran out of his Keppra 4 days ago." Filing 10-1 at 283 (AR 623).

Mark N. saw Dr. James Bobenhouse, MD, on May 24, 2023, at Neurology Associates because of his seizures. Filing 10-1 at 110 (AR 450). Dr. Bobenhouse wrote that Mark N. "has been on Keppra therapy long-term at a dose of 1500 mg twice daily. He had done fairly well on the Keppra therapy but has had occasional breakthrough seizures when he is under stress or has an asthma attack. Recently he had gone off of his Keppra for 2 weeks and had 2 breakthrough seizures 3 weeks ago." Filing 10-1 at 110 (AR 450). Dr. Bobenhouse reviewed a CT scan and an MRI scan of Mark N.'s brain. Filing 10-1 at 114 (AR 454). These scans showed "left frontal deep white

matter hypodensity" and "left deep frontal white matter mixed density cystic lesion which was nonenhancing. There were no diffusion abnormalities at that time." Filing 10-1 at 114 (AR 454). Dr. Bobenhouse "recommended the patient continue on the Keppra 1500 mg twice daily." Filing 10-1 at 114 (AR 454).

ii. Shoulder Pain

Mark N. visited Dr. William Naylor, DO, at Bryan Medical Center West Campus Ortho Trauma Clinic on October 5, 2022. Filing 10-1 at 127 (AR 467). Dr. Naylor reported,

> The patient states he may have had a seizure while driving his motorized bike and crashed on 9/17/2022. He noted significant right shoulder pain. . . Since [the] accident, he has had difficult[]y raising his arm. He has had right shoulder pain that radiates to the elbow with certain movements. Immobilization helps this pain. He states he [] currently should be on seizure medication but is not seeing anybody for that and does not have a current prescription.

Filing 10-1 at 128 (AR 468).

Dr. Juris Purins, MD, wrote that an MRI on October 20, 2022, of Mark N.'s right shoulder revealed:

> There is a Type 1 flat undersurface acromion present. A small amount [of] fluid is present in the far anterior and posterior subacromial bursa, although no rotator cuff tear is identified. There are mild degenerative changes of acromioclavicular joint without a dominant anterior impression upon the musculoskeletal junction of the supraspinatus tendon.

Filing 10-1 at 185 (AR 525).

On October 31, 2022, Mark N. went to the emergency room at CHI Health St. Elizabeth, where he was seen by Dr. Anthony Cook, MD, for sharp pain in his left shoulder. Filing 10-1 at 277 (AR 617). Mark N. was referred to an orthopaedic surgeon because of a "[c]losed displaced fracture of greater tuberosity of left humerus." Filing 10-1 at 281 (AR 621).

On February 8, 2023, Mark N. saw Dr. Austin Becker, PT, DPT. Filing 10-1 at 40 (AR 380). Dr. Becker described Mark N.'s condition:

> [I]n October 2022, [Mark N.] was sitting and reached down with his R arm and felt a pop in his L shoulder. The pain was so high that he went to the ER and had X-rays taken which showed a fracture. He followed up with Dr. Harbert at NOC [Nebraska Orthopaedic Center] and was told it didn't require surgery but to try PT. He didn't [] receive any PT until following up with his PCP [primary care provider] on 2/6/23 who suggested PT again. He reports that he has pain with most reaching activities specifically out to the side and bend[ing] his head and back. He has tried to stretch every [] day and uses heat occasionally. He does complain of numbness and tingling in his hand and sometimes forearm that occurs randomly or when he shifts his shoulder. He has tried a lot for the pain hasn't found anything that helps other than Tramadol which he uses occasionally. He denies any past injuries to the shoulder. He mentions sleeping is difficult, both falling asleep and staying asleep. He mentions a past surgery on his L leg for "cystic fibrous dysplasia" in where they took out a tumor from his bone when he was younger. He also reports a R shoulder bone spur, thyroid issues, and history of seizures which haven't occurred for a [] while.

Filing 10-1 at 40 (AR 380).

On February 10, 2023, Mark N. saw Melissa Taylor, PTA, of Central Nebraska Rehabilitation Services LLC. Filing 10-1 at 45 (AR 385). She reported that Mark N. stated that "his left shoulder pain has been intermittent with movement and 2/10 on pain scale rating. He is very happy with his progress so far. States his motion has been so much better since his initial evaluation." Filing 10-1 at 45 (385).

Mark N. saw Dr. Becker on February 13, 2023, after Mark N. was fifteen minutes late to the session. Filing 10-1 at 48 (AR 388). At this appointment, Mark N. "denie[d] any pain currently and mention[ed] that he is able to use his L arm more for tasks around the house." Filing 10-1 at 48 (AR 388). On February 15, 2023, Mark N. reported to Dr. Becker that he dislocated his right shoulder the night before, but Mark N. was able to "'pop it back in' and was in severe pain for 10 minutes before he was able to falls [sic] asleep. He reports that his L shoulder is 'feeling fantastic.'"

Filing 10-1 at 51 (AR 391). Mark N. saw Dr. Becker on February 20, 2023, and Mark N. expressed disappointment to Dr. Becker because he followed-up with "Dr. Bott today who suggested having surgery. He state[d] his shoulder feels sore and increased [in] pain today after the weekend doing chores and getting bumped by his dog, rating it 9/10. He mention[ed] that surgery wouldn't be for at least 3 weeks." Filing 10-1 at 54 (AR 394). On February 22, 2023, Mark N. told Dr. Becker that "his L shoulder popped out of place last night and he struggled with putting it in to place. He reports he has not heard back regarding surgery yet but is hoping to see a neurologist as increased stress tends to increase his seizure activity." Filing 10-1 at 57 (AR 397).

Mark N. had a left shoulder open rotator cuff repair surgery on April 14, 2023. Mark N. opted for surgery after "[r]adiographs and CT scan revealed an impaction fracture of the greater tuberosity with a displaced fragment." Filing 10-1 at 125 (AR 465). Dr. Aaron Bott, MD, of Nebraska Orthopaedic Center, described the operation:

> An anterior incision was made over the delfopectoral interval of the shoulder. Dissection was taken down through this interval, with retraction of the cephalic vein, and the fascia was incised. The interval between the rotator cuff and the deltoid was established using digital manipulation and release with electrocautary and instrumentation. This interval was extremely scarred down from the previous injury. The area of the fracture on the humeral head was exposed via electrocautery and there were thick bands of scar and/or rotator cuff tissue attached to it that was released. Dissection was carried down to the fragment of bone which was sitting very posteriorly. It had migrated medially relative to the previous CT scan and was lodged behind the posterior superior aspect of the glenoid. I spent about an hour trying to free up this fragment, but despite releasing adhesions on its outer surface and undersurface, it still would not mobilize significantly and could not be reduced to its native footprint on the humeral head. Therefore, fixation of this fragment had to be abandoned. It was likely scarred down due to the prolonged timeframe between his injury and the attempted fixation. The wound was copiously irrigated multiple times during this portion of the procedure.
>
> Attention was turned to the rotator cuff repair. What appeared to be remnants of the supraspinatus tendon as well as remnants of the infraspinatus and teres minor tendons were developed and debrided to stimulate healing response. The bony aspect of the fracture site at the greater tuberosity was also roughened and debrided

> to stimulate healing response. Two Mitek triple loaded Healix anchors were then placed after use of an awl. The sutures were passed through the tendons using a free needle. They are tied down and nicely reduced the tendons back to the footprint. The tails were cut. The wound was irrigated one last time.

Filing 10-1 at 86 (AR 426). On April 27, 2023, Mark N. saw Dr. Bott, and Dr. Bott reported that Mark N.'s "pain is under control. He is taking Tramadol and Oxycodon for pain." Filing 10-1 at 79 (AR 419).

Mark N. went to St. Elizabeth Sports & Physical Therapy on May 24, 2023, and saw Dr. Becker. Filing 10-1 at 60 (AR 400). Dr. Becker discussed Mark N.'s condition after his April surgery:

> [Mark N.] underwent L shoulder surgery on 4/14/23 for a L rotator cuff repair and attempted greater tuberosity fracture fixation. He cannot recall the exact specifications of the surgery but states "they took the bone out" and "I'll eventually need a total shoulder replacement." He was being seen prior to the surgery for his shoulder pain and would often feel his shoulder pop and shift. He states that he has been doing very well since the surgery and slowly weaning out of his immobilizer per Dr. Bott's approval. He has been sleeping well other than last night which was his first night trying to sleep without the immobilizer. His pain has been good but today is a little higher at the start of the session due to seeing his neurologist and pushing up with his arm. He has been doing exercises with his L arm, pendulums and stretching as able, and slowly starting to use his arm more and raising his L arm with assistance from R arm. He states the shoulder feels tight and initially got a pinching in his wrist when he took his brace off to stretch that "brought me to tears." He gets occasional numbness in the palm of his hand but is becoming less frequent. He has been icing his shoulder as needed and massaging the front of his shoulder to help the muscles relax.

Filing 10-1 at 60 (AR 400).

On May 31, 2023, Mark N. saw Taylor, PTA, complaining of soreness in his shoulders. Filing 10-1 at 2 (AR 342). At this time, Mark N. was six weeks post-op, and he rated his pain a three-to-four out of ten on a pain scale rating. Filing 10-1 at 2 (AR 342). At this appointment, Mark N. reported that he had gone without his immobilizer for "the last few days and at night time." Filing 10-1 at 2 (AR 342). Taylor wrote that Mark N. had "[s]ignificant atrophy throughout deltoid,

pinatus and infraspinatus. Patient has difficulty with relaxation of muscles, likely due to neurological condition." Filing 10-1 at 2 (AR 342). The session included therapeutic procedures, and Taylor concluded that "[p]atient would benefit from skilled therapy services to help improve mobility and activity tolerance and strength. I did not progress today as he was fatigued by the end of session today." Filing 10-1 at 2 (AR 342).

Mark N. visited Taylor again on June 5, 2023. Filing at 10-1 at 8 (AR 348). Taylor reported that Mark N. commented that he "currently has no pain. Mentions he felt okay after last session. He has been taking tramadol as needed but hasn't needed it today." Filing 10-1 at 8 (AR 348).

At an appointment on June 7, 2023, Mark N. was seen by Dr. Becker. Filing 10-1 at 11 (AR 351). Dr. Becker noted that "[p]atient did better today with his precaution awareness and needed less frequent reminders. His ROM [range of motion] has improved and he continues to be in minimal pain." Filing 10-1 at 11 (AR 351). Mark N. returned to Central Nebraska Rehabilitation Services LLC, on June 9, 2023. Filing 10-1 at 14 (AR 354). Mark N. had not "been taking any pain meds. Rates his pain at 5/10 currently. He thinks the humid weather has a big part to do with it." Filing 10-1 at 14 (354).

On June 12, 2023, Mark N. visited Dr. Becker again, and Dr. Becker wrote, "Patient reports feeling better today compared to the previous week with minimal pain. He thinks last week's pain is due to the weather and he has not worn his brace since Saturday." Filing 10-1 at 17 (AR 357). Once more, on June 14, 2023, Mark N. saw Dr. Becker. Filing 10-1 at 20 (AR 360). Dr. Becker wrote that "[Mark N.'s] ROM has improved well and he has minimal discomfort and tightness noted at end ranges. He has progressed nicely so far, will continue to work on AROM [active range of motion] and glenohumeral and scapulothoracic rhythm with movements but patient may struggle with ability to control movements." Filing 10-1 at 21 (AR 361).

On June 16, 2023, Taylor, PTA, saw Mark N. at Central Nebraska Rehabilitation Services LLC, reporting that Mark N. had "no shoulder pain today. . . Patient forgot appointment time and arrived 25 minutes late." Filing 10-1 at 24 (AR 364). Mark N. saw Taylor again on June 28, 2023, and Taylor wrote that "Mark arrive[d] after being gone for a few visits due to his seizure last week. . . . Overall has had some more discomfort since seizure." Filing 10-1 at 36 (AR 376).

On July 27, 2023, Mark N. saw Dr. Bott. Filing 10-1 at 72 (AR 412). Dr. Bott described Mark N.'s condition as follows:

> The patient is a 35 year old male who presents today with right shoulder pain. The onset occurred gradually over the last over [sic] 1 year. At its worst the pain is severe with a rating of 10/10. At its best the pain is moderate with a rating of 5/10. He describes the symptoms as aching, burning, dull, sharp, stabbing and throbbing. The symptoms are frequent. Since the onset, he reports the problem is getting worse. The patient experiences catching, clicking, decreased range of motion, instability, grinding, night time discomfort, popping, swelling, weakness, locking, stiffness and snapping. He reports numbness in the shoulder, elbow, wrist and fingers. The symptoms are relieved by elevation, lying down and stretching. The symptoms are made worse with cross body movement, reaching behind back, extension, bending arm, activity, lifting weights, lifting away from body, any movement, overhead movement and reaching.

Filing 10-1 at 72 (AR 412). It was also noted that "[Mark N.'s] right shoulder pops out of place frequently[.] Patient has an appointment with Dr[.] Whitten for pain in his LEFT shoulder. He has had previous surgeries with Dr[.] Bott on his Left Shoulder." Filing 10-1 at 72 (AR 412). Dr. Bott recommended an "MRI with intra-articular contrast to further evaluate the soft tissues of the shoulder joint," which Mark N. agreed to. Filing 10-1 at 73 (AR 413).

On August 2, 2023, Mark N. saw Dr. Ruilin Wang, MD, at Southeast Lincoln Family Medicine & Internal Medicine. Filing 10-1 at 99 (AR 439). Dr. Wang's diagnoses included "[l]eft shoulder pain," "[m]oderate asthma," "[s]eizure disorder," and "[a]ttention deficit hyperactivity disorder (ADHD)." Filing 10-1 at 102 (AR 442).

On September 12, 2023, Dr. Bott saw Mark N. for a follow-up regarding his right shoulder recurrent dislocation. Filing 10-1 at 68 (AR 408). Mark N. reported his pain was a six out of ten. Filing 10-1 at 68 (AR 408). Dr. Bott reported that "[p]atient has been attending physical therapy but this has been making [his] symptoms worse." Filing 10-1 at 68 (AR 408). Dr. Bott's diagnoses included chondromalacia of the right shoulder, recurrent dislocation of the right shoulder, "[o]ther sprain of right shoulder joint, subsequent encounter," and primary osteoarthritis of the right shoulder. Filing 10-1 at 69 (AR 409). Dr. Bott discussed treatment options with Mark N., and Mark N. determined that he wanted to proceed with surgery. Filing 10-1 at 69 (AR 409).

On November 15, 2023, Mark N. had the following procedures performed by Dr. Bott: right shoulder arthroscopy bankart, rotator cuff remplissage, chondroplasty, and loose body removal. Filing 10-1 at 332 (AR 672). Dr. Bott summarized the procedure details:

> The joint was carefully inspected throughout. There were several loose cartilaginous bodies that were removed from the joint. . . There was also extensive chondromalacia along the glenoid which required gentle chondroplasty with the shaver.
>
> There was a large, extensive tear of the anterior labrum . . . . An extensive amount of time was spent elevating the labrum from the anterior glenoid and preparing the surfaces. This included use of the ring curette on the rim of the glenoid, and use of . . . . the shaver on the bony surfaces and undersurface of the labrum and bony Bankart. Accessory portals were established including a Birdseye view portal and a trans-subscapularis portal. Four Mitek double-loaded Gryphon anchors were placed in the anterior glenoid rim after drilling . . . . nicely reduced the labrum and bony Bankart back to its native position and held it firmly secured . . . .
>
> The Hill-Sachs lesion was very large and involved both the posterior and the superior aspect of the humeral head . . . .
>
> The shoulder was drained and the portal sites were closed with 4-0 monocryl and Steri-Strips. Local anesthetic was injected to help with postoperative pain control . . . . There were no known complications.

Filing 10-1 at 332-33 (AR 672-73).

Dr. Bott saw Mark N. on December 28, 2023, and he wrote that Mark N. "needs to start physical therapy according to the appropriate protocol and is to not do any activities outside of those included in the instructions of the protocol. I have provided him a new script." Filing 10-1 at 542 (AR 882).

Mark N. saw Dr. Austin Reilly, MD, on February 8, 2024, at Nebraska Pain Institute. Filing 10-1 at 524 (AR 864). At the visit, Mark N. complained of right shoulder pain, and he rated his pain as an eight out of ten. Filing 10-1 at 524 (AR 864). Mark N.'s illness history noted that "[h]e does not take any pain medications. He has not received any injections. The patient reports he is in the process [of] getting physical therapy approved." Filing 10-1 at 524 (AR 864). Dr. Reilly concluded, "I do not believe additional medications are warranted at this time. He received 30 milligrams IM ketorolac in clinic as described in the procedure note below. I will schedule right shoulder intra-articular steroid injection with fluoroscopy." Filing 10-1 at 536 (AR 876).

Mark N. revisited Dr. Bott on February 15, 2024. Filing 10-1 at 539 (AR 879). At the appointment, Mark N. reported that his pain was moderate, rating it as a five out of ten. Filing 10-1 at 539 (AR 879).

Mark N. saw Dr. Becker again on February 21, 2024. Filing 10-1 at 550 (AR 890). Dr. Becker's assessment stated:

> Mark appears to be doing well following his surgery even though he was delayed with starting therapy. He was stressed the importance to avoid positions which may cause future damage to his shoulder and to be extra careful around his large dogs when trying to corral them. He was initiated on gentle AAROM [active assisted range of motion] exercises and isometrics to improve ROM and strength. Will progress as able, and given patient's past experience, this progression may require increased duration. Patient would benefit from skilled therapy services to help improve R shoulder ROM and strength, reduce pain frequency and intensity, and allow patient to return to his normal life activities without limitation.

Filing 10-1 at 551 (AR 891). At an appointment on February 28, 2024, Dr. Becker noted Mark N. was "overall happy with his improvement thus far and his ROM. He did not feel the need to ice after his last session and states he was able to sleep a little on his R shoulder last night." Filing 10-1 at 560 (AR 900).

Dr. Becker saw Mark N. on March 11, 2024, and Dr. Becker included in his progress summary that Mark N. "mentions his pain is mostly controlled but continues to limit his sleeping at this time. He reports improvement in his QuickDASH score from 84 to 68. He mentions feeling 85-90% back to where he wants to be and feels he is most limited when reaching up his back and anything overhead." Filing 10-1 at 593 (AR 933). Regarding Mark N.'s sleep problems, Dr. Becker wrote, "Patient reports that his shoulder hasn't bothered him too much today and he was able to get some sleep last night but continues to struggle with getting comfortable. He mentions he sleeps on a futon with 4 dogs." Filing 10-1 at 593 (AR 933).

iii. Leg Pain

On September 20, 2023, Mark N. saw Dr. Wang for leg problems. Filing 10-1 at 98 (AR 438). Dr. Wang's diagnoses at the visit included "[l]eg pain, central, left" and "[m]ild major depression." Filing 10-1 at 98 (AR 438).

On September 21, 2023, Mark N. saw Dr. Bryce Hansen, MD. Filing 10-1 at 180 (AR 520). Dr. Hansen found "[that the] [p]rior ORIF [open reduction and internal fixation] of the tibia [had] hardware intact. Unchanged sclerosis at the mid tibia. No periosteal reaction. No mass effect or radiopaque foreign body. No new abnormal sclerosis or lucency. No fracture or malalignment." Filing 10-1 at 180 (AR 520).

On September 21, 2023, after Mark N. complained of leg pain, Dr. Andrea Ulm, MD, wrote that Mark N.'s "[l]eft lower extremity demonstrates no evidence of deep vein thrombus or superficial thrombophlebitis." Filing 10-1 at 480 (AR 820).

Mark N. went to Bryan Urgent Care – Northwest/NorthPointe on March 1, 2024, due to right leg pain after falling off his scooter. Filing 10-1 at 573 (AR 913). Cindy Keckler, APRN-NP, wrote, "Care at this point will be supportive in nature. Modify your activity as needed to the right lower extremity. May apply compression, ice and elevation to the right lower extremity. Tylenol or ibuprofen as able to take for pain." Filing 10-1 at 576 (AR 916).

iv. Mental Health

On October 15, 2023, Mark N. went to the emergency department at CHI Health St. Elizabeth because of pain in his right hand. Filing 10-1 at 304 (AR 644). He was seen by Tysha Bryant, APRN. Filing 10-1 at 304 (AR 644). Mark N. stated that he "was in a verbal argument with somebody and instead of hitting the person he hit something hard." Filing 10-1 at 304 (AR 644). Mark N. made concerning statements at this visit. Mark N. said, '"I could go home an[d] slit my sister's throat in front of her kids and she'd deserve it for what she put me through, but I won't.'" Filing 10-1 at 301 (AR 641). Michele Phillips, PLMHP, PLADC, wrote a summary of the crisis response situation. She stated:

> Client reported a long history (approximately 15 years) of conflict with his sister. Client also reported that he has been living with his mother and now his sister[,] has requested [] moving into the house and client fears that the conflict and harassment will begin all over again. I asked client if he was a danger to his sister and he reported that he is not, but that he just gets mad sometimes and has to "spout off." Client denied any current SI [suicidal ideation] or active plan to hurt himself or kill himself but reports that he does wish that he could go to steep and not wake up the next morning. . . Client reports that he does not see a therapist and has no diagnosis and has never been prescribed mental health medications. Client does wish to talk with case management and see what they can offer him.

Filing 10-1 at 302 (AR 642).

Mark N. saw Dr. Gail Ihle, Ph.D., of Midtown Medical Group PLLC on February 7, 2024. Filing 10-1 at 517 (AR 857). Dr. Ihle noted that Mark N.'s "hygiene was poor; he had an odor about him. Claimant did not use any adaptive devices to walk or move, but he walked slowly with a slight limp." Filing 10-1 at 517 (AR 857). Mark N. told Dr. Ihle "that his doctors have told him that he takes 'a massive amount of the generic Keppra' - 3000g/day for his seizures. He stated that he has had seizures his entire life and they are getting worse. They are triggered by stress, exhaustion, and pain." Filing 10-1 at 519 (AR 859). Dr. Ihle wrote that "[Mark N.] has not been in counseling, but he thinks it would be helpful to him." Filing 10-1 at 519 (AR 859). Dr. Ihle commented on Mark N.'s mental function, writing:

> Claimant was able to recall three of three words after a brief delay. He was able to count backward from 10 to 1. He was able to name the current U.S. president. He was not able to interpret a proverb. He was not able to do serial 7's. He spelled world correctly forward and backward. His thinking is concrete; his judgment and insight appear limited. His short-term and long-term memories appear adequate.

Filing 10-1 at 520 (AR 860). Regarding Mark N.'s adaptive functioning, Dr. Ihle reported, "In the morning, [Mark N.] takes the dogs out and after that he has to rest for a while due to pain. Then he does 'normal day stuff' and spends time on his phone." Filing 10-1 at 520 (AR 860). Dr. Ihle further wrote that "[Mark N.'s] focus was poor at times during the interview. He appears to be quite distracted by his medical/physical problem." Filing 10-1 at 520 (AR 860). Dr. Ihle concluded that Mark N.'s "functioning seems quite limited due to his physical problems, which are beyond my scope of practice to assess. His mental health problems, while present, do not seem debilitating." 10-1 at 521 (AR 861).

Mark N. saw Nicholas Franssen, APRN, on July 30, 2024, for a medicine check. Filing 10-1 at 627 (AR 967). At this appointment, Mark N. appeared to be "well-developed and well-

groomed." Filing 10-1 at 631 (AR 971). Franssen concluded that Mark N.'s "HQ-9 [health questionnaire] is high today. Discussed starting medications for depression. Will start him on sertraline 100 mg daily along with referring to psychiatry." Filing 10-1 at 635 (AR 975).

b. Self and Lay Assessments of Mark N.'s Functionality

Mark N. completed a function report for use by the Social Security Administration in considering his application for disability benefits. In his report, Mark N. claimed his ability to work is limited due to random epileptic grand mal seizures, a permanent limp from cystic fibrosis dysplasia, memory and anger issues due to a lesion on his front left temporal lobe, and damaged shoulders. Filing 9-6 at 27 (AR 284). In a disability report created by attorney F. Anthony Mannella, Mark N.'s listed medical conditions included: epilepsy, "shoulder surgery 4/14/23 but needs shoulder replacement," cystic fibrosis dysplasia in the left tibia, left leg hardware, lesion on temporal lobe allegedly causing seizures and memory loss, asthma, and hypothyroidism. Filing 9-6 at 7 (AR 264). As a result of his conditions, a normal day to Mark N. includes waking up, taking his medicine, and caring for the dogs. Filing 9-6 at 28 (AR 285). Regarding household chores, Mark N. noted that he "can't do yard work, no pushing or pulling," but he wrote that he "can do pretty much anything except move furniture." Filing 9-6 at 29 (AR 286) (reduced from all capitals).

Mark N. claimed that his abilities are limited, referencing issues with memory, concentration and understanding, ability to lift, squat, bend, stand, reach, walk, kneel, talk, climb stairs, complete tasks, use hands, and get along with others. Filing 9-6 at 32 (AR 289). These particular items, Mark N. claimed, are affected by "the dysplasia and shoulder[] issue[]s effect on being able to do stuff, doing a job or socialization." Filing 9-6 at 32 (AR 289) (reduced from all capitals). Mark N. checked that he had no problem with his personal care, but his shoulders limit his ability to brush and take care of his hair. Filing 9-6 at 28 (AR 285).

c. Evaluations of Mark N.'s Medical History by Medical Consultants

At the initial level of consideration, Mark N.'s medical records were reviewed by Dr. Jeffrey Stahl, MD, and a psychologist, Dr. Justine Uselding, Ph.D. on March 20, 2024, and March 6, 2024, respectively. Filing 9-3 at 20-21 (AR 84-85). Regarding Mark N.'s physical health, Dr. Stahl wrote that Mark N. should never use rope ladders, can stand and/or walk more than six hours on a sustained basis, can sit for a total of more than six hours on a sustained basis, is limited to twenty pounds of occasional lifting and carrying, and is limited to ten pounds of frequent lifting and carrying. Filing 9-3 at 18 (AR 82). Dr. Stahl also noted that Mark N. can occasionally crawl, crouch, kneel, and stoop. Filing 9-3 at 8 (AR 72). Dr. Stahl explained his findings, writing:

> [Mark N.] had a remote L tibial fracture evidently related to underlying cystic fibrosis with prior graft from hip to L tibia which has caused a long-term limp due to pain, not always noted, though on exams. . . There is h/o [history of] seizures controlled with Keppra, non-severe since well-controlled. Migraines are intermittent and non-severe with no regular meds—OTCs [over the counter] when occur . . . . There is no evidence of the claimed L temporal lobe lesion. He reported abuse as a child living at home but currently lives with mother and new husband, an inconsistency.

Filing 9-3 at 9 (AR 73).

Dr. Uselding determined Mark N. has moderate limitations on his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and respond appropriately to changes in the work setting. Filing 9-3 at 10-11 (AR 74-75). Dr. Uselding mentioned that Mark N. does not have understanding and memory limitations. Filing 9-3 at 10 (AR 74). Dr. Uselding's consistency discussion noted,

> The claimant's statements regarding his functional limitations related to his mental MDIs [medically determinable impairments] are inconsistent with the MER [medical evidence of record] and other evidence of record; the MER is internally consistent and is largely consistent with MSO [medical source opinion]. The persuasiveness of [the] claim of memory problems is partially eroded by claimant's

> continued use of cannabis, which is well-known to exert a negative effect on memory function.

Filing 9-3 at 11 (AR 75). Dr. Uselding then concluded,

> The claimant does not demonstrate significant impairments in his ability to understand, remember or apply information. He will have some moderate problems handling stress/changes in routine. He is not significantly limited socially. His attention, concentration, and pace may vary wrt [with reference to] mood but are adequate for simple, routine tasks not requiring sustained attention. The preponderance of evidence in [the] file indicates that the claimant is able to complete 1-2 step tasks on a sustained basis in a supportive work environment.

Filing 9-3 at 11 (AR 75).

Drs. Stahl and Uselding determined that Mark N. had a light maximum sustained work capability. Filing 9-3 at 12 (AR 76).

At the reconsideration level, Mark N.'s medical records were reviewed by Dr. Kevin Wycoff, MD, and Dr. Patricia Newman, Ph.D., on June 12, 2024. Filing 9-3 at 33-34 (AR 97-98). Dr. Wycoff found that Mark N. can occasionally lift and/or carry up to twenty pounds and can frequently lift and/or carry up to ten pounds. Filing 9-3 at 31 (AR 95). Dr. Wycoff believed that Mark N. can stand and/or walk for a total of about six hours in an eight-hour workday. Filing 9-3 at 31 (AR 95). Dr. Wycoff's report also stated that Mark N. can sit for a total of more than six hours in an eight-hour workday. Filing 9-3 at 31 (AR 95).

Dr. Newman concluded that Mark N. is moderately limited in his ability to carry out detailed instructions, maintain attention, and concentrate for extended periods. Filing 9-3 at 33 (AR 97). Dr. Newman wrote that "Mark N. remains able to maintain focus, pace, and persistence for simple tasks for 2-hour periods over an 8-hour workday w/in a normal 40-hour work schedule." Filing 9-3 at 33 (AR 97). Dr. Newman reported that Mark N. is moderately limited in his ability

to respond appropriately to changes in the work setting, but she then stated that "[Mark N.] can adapt to changes, which are predictable and introduced gradually." Filing 9-3 at 34 (AR 98).

Drs. Wycoff and Newman assigned a light work capacity to Mark N. Filing 9-3 at 35 (AR 99).

d. Mark N.'s Personal Testimony at the ALJ Hearing

On November 4, 2024, the ALJ held a telephone hearing to review Mark N.'s case. Mark N. testified that he was not working at the time of the hearing, but he was thinking about looking for work, including "handyman work." Filing 9-2 at 39-40 (AR 38-39). Mark N. stated that his last job was at Schumaker's Truck Stop. Filing 9-2 at 40 (AR 39). Mark N. testified that he had not had a seizure for some time, prompting him to attempt to get his driver's license. Filing 9-2 at 44 (AR 43). He stated, "I have been on my medicine as scheduled and been trying to keep myself as relaxed and not as stressed as possible because I have noticed that due to a lesion on my front left temple [sic] lobe. . . I have the seizures. . . ." Filing 9-2 at 44 (AR 43). Mark N. testified that "the last migraine [he] had was about two weeks ago, three weeks ago. The last seizure I had was over eight months ago." Filing 9-2 at 45 (AR 44). Mark N. also stated that he has memory issues. Filing 9-2 at 53 (AR 52). He broadly described his problems, which included "general issues moving my right shoulder. Or my right shoulder or left shoulder and walking overall is general pain [sic]." Filing 9-2 at 54 (AR 53). Mark N. claimed that he would struggle to work as a cashier because of memory issues. Filing 9-2 at 60 (AR 59). When asked by the ALJ if he would be able to work on equipment like lawn mowers or snow blowers if hired, Mark N. said, "[I]t wouldn't be much of an issue if I could actually get hired on." Filing 9-2 at 58 (AR 57).

*3. The ALJ's Impairment Findings*

Under 20 C.F.R. § 416.920(b), an ALJ will follow a "five-step process for considering disability claims." *Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (quoting *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)). The ALJ will consider the following during that analysis:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal citation omitted)). The claimant generally bears the burden of proving he or she is disabled at the first four steps of the process, while the ALJ bears the burden of proving a claimant is not disabled at step five. 20 C.F.R. §§ 416.912(a)-(b), 416.960(c)(2). If the ALJ finds the claimant is not disabled at steps one, two, four, or five, or finds the claimant is disabled at steps three or five, the ALJ will end the analysis. 20 C.F.R. § 404.1520(a).

At the first step of the five-step sequential process, an ALJ will find a claimant is not disabled if the claimant is working and that work is considered substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial gainful activity is work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. Substantial work activity is defined as "work activity that involves doing significant physical or mental activities." *Id.* at (a). Gainful work activity is defined as "work activity that you do for pay or profit." *Id.* at (b). In this case, the ALJ determined Mark N. had not engaged in substantial gainful activity since his alleged onset date of August 17, 2022. Filing 9-2 at 18 (AR 17). The ALJ proceeded to the next step of the analysis.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). A

claimant's impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). If an ALJ finds the claimant's medically determinable impairment or combination of impairments is not severe, the claimant is not disabled. *Id*. In this case, the ALJ determined Mark N.'s degenerative joint disease of the bilateral shoulders with residuals of surgery, residuals of tibia fracture surgery, epilepsy, anxiety disorder, and depressive disorder were severe impairments. Filing 9-2 at 19 (AR 18).

At the third step of the process, the ALJ will ascertain whether the claimant's impairment or combination of impairments is of a severity to meet the listed criteria in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment does meet the listed criteria the ALJ will find the claimant is disabled; if, however, the ALJ determines the claimant's impairment does not meet the listed criteria then the ALJ proceeds to step four. *See Id*. The ALJ found that none of Mark N.'s impairments, individually or in combination, are of a severity to meet the listed criteria under 20 C.F.R. Pt. 404, Subpt. P, App. 1, which prompted the ALJ to proceed to step four of the analysis. Filing 9-2 at 19 (AR 18).

*4. The ALJ's RFC Findings*

At step four of the five-step analysis, the ALJ will first determine the claimant's RFC, then assess the claimant's RFC (residual functional capacity) in consideration of the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is her ability to do physical and mental work despite limitations from her impairments. 20 C.F.R. § 404.1545(a). "A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)); *see also* 20 C.F.R. § 404.1512(a). The ALJ determines a claimant's RFC by using all relevant evidence in the

claimant's case record, "including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Id.*; *see also* 20 C.F.R. § 404.1545(a). The ALJ gave Mark N. the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he: can stoop, kneel, crouch and crawl occasionally; is able to reach overhead occasionally; is able to perform work that does not require exposure to concentrated fumes or dust and does not require climbing ladders or other exposure to hazards such as work at unprotected height; can perform simple tasks; can exercise proper judgment in performing those tasks; can respond appropriately to routine changes in the workplace; and is able to interact with coworkers, supervisors, and the public occasionally.

Filing 9-2 at 21 (AR 20).

Following the ALJ's determination of the claimant's RFC, the claimant's RFC will be compared to his or her past relevant work. 20 C.F.R. § 404.1520(f); *see also* 20 C.F.R. § 404.1560(b). Past relevant work is substantial gainful activity claimant performed within the past five years or five years prior to the date disability must be established, and that substantial gainful activity lasted long enough for the claimant to learn to do the work. 20 C.F.R. § 416.960(b)(1); *see generally* 20 C.F.R § 416.965(a). If the claimant has the RFC to do her past relevant work the ALJ will conclude the claimant is not disabled and the analysis ends, but if the claimant is unable to do any past relevant work or does not have any past relevant work the ALJ proceeds to the fifth and final step. 20 C.F.R. § 404.1520(f). Here, the ALJ determined the claimant is unable to perform any past relevant work, including work as a product assembler. Filing 9-2 at 27 (AR 26).

At the fifth and last step of the disability analysis, the ALJ considers the claimant's RFC, age, education, and work experience to determine if the claimant is capable of adjusting to other work. 20 C.F.R. § 404.1520(a)(4)(v). Once a claimant proves her inability to do past relevant work, the burden of proof switches from the claimant to the Commissioner to establish that the claimant

possesses an RFC to do other work and that the other work exists in substantial numbers in the national economy, though this burden is limited, and the claimant still bears the ultimate burden of persuasion to establish she is disabled. *Goff*, 421 F.3d at 790 (internal citation omitted); *see also* 20 C.F.R § 404.1560(c). If the claimant can make an adjustment to other work that exists in the national economy, the ALJ will find the claimant is not disabled. 20 C.F.R. § 404.1520(g). Conversely, if the claimant cannot adjust to other work or that other work does not exist in the national economy, the ALJ will find the claimant is disabled. *Id.*; *see generally* 20 C.F.R. § 404.1566. In determining a claimant's ability to adjust to other work and if other work exists in the national economy, an ALJ may call on a vocational expert (VE) to testify at the administrative hearing. *Id.* at (e). The VE's role is "to take into account medical limitations, including opinions as to work time limits, and offer an opinion on the ultimate question whether a claimant is capable of gainful employment." *Swedberg v. Saul*, 991 F.3d 902, 905 (8th Cir. 2021) (quoting *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995)).

In the present case, the VE testified that a hypothetical individual of Mark N.'s age, education, and RFC could perform the positions of marker, garment sorter, and collator operator, which are jobs included in the DOT, the primary source for occupational information. Filing 9-2 at 28 (AR 27). Given "the testimony of the vocational expert, the [ALJ] conclude[d] that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Filing 9-2 at 28 (AR 27).

## II. LEGAL ANALYSIS

### A. Standard of Review

A Social Security claimant must proceed through four levels of administrative review, including an Appeals Council review of the ALJ's decision, before the claimant may obtain judicial review in federal district court. *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019); *see also* 42 U.S.C. § 405(g). Once at the federal district court level, the court will "decide whether the [ALJ]'s findings 'are supported by substantial evidence on the record as a whole.'" *Bowers v. Kijakazi*, 40 F.4th 872, 874 (8th Cir. 2022) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000) (omission in original)). "Substantial evidence [on the record as a whole] is less than a preponderance of the evidence" and is "such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (quoting *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (internal citation and quotation marks omitted)). '"Substantial evidence in the record as a whole' is a more 'rigorous' standard than simply 'substantial evidence'" since the former standard requires consideration of evidence that supports or detracts from the ALJ's determination, whereas the latter does not. *Schmitt v. Kijakazi*, 27 F.4th 1353, 1358 (8th Cir. 2022) (quoting *Koch v. Kijakazi*, 4 F.4th 656, 663 (8th Cir. 2021) (cleaned up and internal citations omitted) ("Substantial evidence in the record as a whole" is a more "rigorous" standard than simply "substantial evidence," which is "evidence that a reasonable mind might accept as adequate to support the Commissioner's conclusion.")). The district court "will not reverse the [ALJ]'s decision merely because [the court] find[s] that 'substantial evidence exists in the record that would have supported a contrary outcome.'" *Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir. 2022) (quoting *Schmitt*, 27 F.4th at 1358) (internal citation and quotation marks omitted)). Rather, "If, after reviewing the record, the court finds it is possible

to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019) (quoting *Goff*, 421 F.3d at 789).

Additionally, the district court must determine whether the ALJ's decision "complies with the relevant legal standards." *Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (internal citation and quotation marks omitted)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (quoting *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (where the ALJ committed legal error by not posing a hypothetical question to the VE) (omission in original)). "In conducting our limited and deferential review of the final agency determination under the substantial-evidence standard, we must view the record in the light most favorable to that determination." *Dols*, 931 F.3d at 744 quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)).

**B. Discussion**

Mark N. asserts three grounds for reversing and remanding the ALJ's decision. First, Mark N. argues the ALJ "failed to either adopt or reject and explain his rejection of limitations offered by medical sources whose opinions he found persuasive." Filing 13 at 1. Second, Mark N. contends "SSA cannot rely upon EM-21065-REV to completely prohibit any consideration of certain parts of the DOT such as reasoning level." Filing 13 at 1. Third, Mark N. maintains "the ALJ's residual functional capacity (RFC) finding is inconsistent with his own finding of severe mental impairments causing moderate limitations in concentration, persistence, or pace." Filing 13 at 1.

*1. The ALJ Properly Considered the Medical Record and Substantial Evidence Exists to Support the ALJ's Finding*

a. The Parties' Arguments

Mark N. contends that "remand is required where the administrative law judge (ALJ) failed to either adopt or reject and explain his rejection of limitations offered by medical sources whose opinions he found persuasive." Filing 13 at 1. Specifically, Mark N. argues that "[a]n ALJ must explain the basis for his findings in order to allow meaningful judicial review." Filing 13 at 3 (internal citation omitted). Furthermore, "[i]f the ALJ accepts the opinion of a medical source, then he is required to include the limitations identified by that medical source in his RFC finding." Filing 13 at 4 (internal citations omitted). Mark N. maintains that "[i]f the ALJ does not accept all or parts of a medical opinion, then the ALJ is required to explain his reasons for rejecting the probative evidence that he did not accept." Filing 13 at 4 (internal citation omitted). Mark N. then specifically addressed the findings of Drs. Uselding, Newman, and Ihle, which he contends that the ALJ improperly failed to include in his RFC.

The ALJ found the opinion of Dr. Uselding, the state agency psychologist at the initial level, "generally persuasive in so far as it is consistent with other evidence in the record." Filing 9-2 at 27 (AR 26). Mark N. emphasizes that Dr. Uselding believed Mark N. was "able to complete 1 to 2 step tasks on a sustained basis in a supportive work environment." Filing 9-2 at 27 (AR 26) (internal citations omitted). Plaintiff argues that "[t]he ALJ did not disagree with or reject any limitations by Dr. Uselding; SSA cannot now offer its own rejection." Filing 13 at 5 (internal citations omitted). Importantly, the ALJ's RFC did not include a one-to-two step task limitation. Filing 13 at 5; Filing 9-2 at 21 (AR 20). The limitation was also not included in the ALJ's "hypothetical question to the VE." Filing 13 at 5; Filing 9-2 at 62 (AR 61). Thus, Mark N. believes

that "[t]he ALJ's failure to adopt this limitation he found persuasive, or otherwise expressly reject it, was not a harmless error." Filing 13 at 6. Mark N. is also unsatisfied with the ALJ's limitation to simple tasks, preferring Dr. Uselding's recommendation of a one-to-two step task limitation. *See* Filing 13 at 8.

The ALJ found the opinion of Dr. Newman, the state agency psychologist at the reconsideration level, "generally persuasive in so far as it is consistent with other evidence in the record." Filing 9-2 at 27 (AR 26). Dr. Newman found that Mark N. "can adapt to changes which are predictable and introduced gradually." Filing 9-2 at 27 (AR 26). Mark N. argues that "[a]lthough the ALJ included a limitation in the RFC that [Mark N.] would be able to respond appropriately to routine changes in the workplace, he did not include that those changes needed to be 'introduced gradually.'" Filing 13 at 9; Filing 9-2 at 27 (AR 26). Therefore, Mark N. concludes that the "ALJ's failure to explain his basis for rejecting, or otherwise not adopting, Dr. Newman's specific finding that [Mark N.] required changes to be introduced gradually was a harmful error." Filing 13 at 10.

The ALJ found the opinion of Dr. Ihle, a consultative psychologist, had "limited persuasive value other than to support the conclusion that the claimant has some limits due to his psychological conditions." Filing 9-2 at 26 (AR 25). Mark N. summarized the findings of Dr. Ihle:

> Dr. Ihle noted that [Mark N.] neglected his hygiene, was not very social, had poor focus at times, and appeared quite distracted by his medical/physical problems (Filing no. 10-1 at 520; Tr. 860). When asked whether [Mark N.] had recurrent episodes of deterioration when stressed that resulted in withdrawal from [a] situation or exacerbation of symptoms, Dr. Ihle responded affirmatively (Filing no. 10-1 at 520; Tr. 860). Specifically, she stated that [Mark N.] "randomly explodes with anger, due to the frustration of his physical situation and not being able to get a psychiatrist to see him" (Filing no. 10-1 at 520; Tr. 860). Dr. Ihle concluded that [Mark N.]'s mental health problems did not seem debilitating, which the ALJ seemed to have relied on (Filing no. 9-2 at 26, 25; Filing no. 10-1 at 520; Tr. 860). But, the fact that Dr. Ihle, who was not a VE, opined that [Mark N.]'s mental

> impairments were not "debilitating" did not mean that the limitations she identified did not need to be included in the RFC or at least evaluated by the ALJ.

Filing 13 at 10-11. Mark N. argues that the ALJ's lack of response regarding Mark N.'s stress and anger outbursts is especially problematic. *See* Filing 13 at 11-12.

Mark N. also questions the reliability of the VE's testimony because "the ALJ adopted the VE's testimony that 185,000 marker jobs exist in the national economy. . . However, several courts have recognized that this occupation no longer exists in significant numbers in the national economy and is obsolete." Filing 13 at 13 (internal citations omitted).

The Commissioner responded to Mark N.'s arguments by noting that "[t]he determination of RFC is an administrative assessment – based on the totality of the evidence – of the extent to which a claimant's impairments and related symptoms affect his capacity to perform work-related activities." Filing 21 at 3 (internal citations omitted). The Commissioner continued,

> [T]he evidence of record supports the ALJ's mental RFC determination. The ALJ considered supportability and consistency when evaluating the persuasiveness of the opinions/PAMFs [prior administrative medical findings] from Justine Uselding, Ph.D., Patricia Newman, Ph.D., and Gail Ihle, Ph.D., which Plaintiff does not dispute. . . Instead, Plaintiff selectively cites portions of this evidence asking the Court to reweigh the evidence in his favor to reach a different conclusion, which goes against the standard of review.

Filing 21 at 4 (internal citations omitted).

Regarding Dr. Uselding's recommendation for a one-to-two-step task limitation, the Commissioner contends,

> Among the evidence the ALJ specifically cited and relied upon were mental health records that Dr. Uselding also relied upon in forming the PAMFs. Indeed, the ALJ indicated that Dr. Uselding supported her findings with explanations (Filing 9-2, Tr. 26). The explanation documented that despite alleging disability since August 2022 and endorsing problems with memory, task completion, concentration, understanding, handling stress/change, and getting along with others including authority figures, Plaintiff had never been psychiatrically hospitalized or undergone

> intensive mental health treatment, had not been seen by a mental health professional for psychotherapy, and was not seeking mental health treatment (Filing 9-3, Tr. 75).

Filing 21 at 4-5. The Commissioner argues that "[w]hile the ALJ found [] Dr. Uselding's PAMFs generally persuasive, he was not required to list each limitation the PAMFs identified and explain why it was not incorporated into the RFC determination." Filing 21 at 5 (internal citations omitted).

Addressing Mark N.'s arguments about a limitation to simple tasks, the Commissioner claims that "[a]s the ALJ correctly evaluated Dr. Uselding's PAMFs including the one to two step limitation in determining that Plaintiff could perform work of a simple nature (Filing 9-2, Tr. 20), there is no conflict with the level two reasoning jobs the ALJ assessed at step five." Filing 21 at 6.

Regarding the adaptive changes limitation recommended by Dr. Newman, the Commissioner noted the ALJ's assessment of a moderate limitation in this area. *See* Filing 21 at 7. The ALJ wrote,

> The claimant does not handle stress or changes in routine well. While the claimant's hygiene was poor at the consultative exam, he had appropriate hygiene at other times. Though the claimant's mood and affect are occasionally marked by periods of dysphoria, anxiety, or anger, it is generally appropriate. The claimant can play video games. Thus, the claimant has a moderate limitation in this functional area.

Filing 9-2 at 21 (AR 20) (internal citations omitted). The Commissioner also contends,

> Plaintiff's argument ignores that Dr. Newman noted Plaintiff could perform simple tasks as set forth in the RFC. It further ignores that while the ALJ did not recite verbatim Dr. Newman's assessment regarding the ability to adapt to changes which are predictable and introduced gradually, the RFC provided for response to routine workplace changes.

Filing 21 at 7-8 (internal citations omitted). Mark N.'s claim regarding the reliability of the VE was dismissed by the Commissioner with the Commissioner maintaining that "even if the Court were to determine one of the jobs, marker, was obsolete as Plaintiff argues, the remaining 40,000

jobs for garment sorter and collator operator are significant in number. Filing 21 at 6 (internal citations omitted).

Regarding Dr. Ihle's notation about Mark N. exploding with anger, the Commissioner contends that the ALJ was not obligated to reconcile all evidence, and that even if it was required, the ALJ would have done so at step three and "in noting that Plaintiff punched a wall in October 2023. . . ." Filing 21 at 8 (internal citations omitted).

b. The ALJ Properly Considered the Medical Record and Substantial Evidence Exists to Support the ALJ's Finding

The ALJ adequately supported his RFC by addressing the exclusion of certain recommendations by Drs. Uselding, Newman, and Ihle. Importantly, this Court must "decide whether the [ALJ]'s findings 'are supported by substantial evidence on the record as a whole.'" *Bowers*, 40 F.4th at 874 (8th Cir. 2022) (quoting *Prosch*, 201 F.3d at 1012 (8th Cir. 2000)). With substantial evidence, the ALJ properly accounted for Dr. Uselding's recommendation that Mark N. was "able to complete 1 to 2 step tasks on a sustained basis in a supportive work environment." Filing 9-2 at 27 (AR 26) (internal citations omitted). The ALJ found Dr. Uselding's opinion to be persuasive and added a simple tasks limitation, demonstrating the one-to-two step limitation was noted. *See* Filing 9-2 at 21 (AR 20). In fact, the ALJ directly addressed his simple tasks limitation determination, writing "[b]y limiting the claimant to simple tasks, among other mental limitations, the undersigned has accounted for the claimant's various mental health diagnos[e]s." Filing 9-2 at 26 (AR 25). Despite finding Dr. Uselding's opinion persuasive, the ALJ did not have to adopt every recommendation in her evaluation. "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents

the ALJ's findings, the court must affirm the ALJ's decision." *See Dols*, 931 F.3d at 744 (quoting *Goff*, 421 F.3d at 789).

The justification Mark N. offers for the importance of the one-to-two step task limitation is that he had poor memory after a seizure, causing him to have "to undergo light training to get back into the hang of things [at work] and that someone would have to watch what he was doing for almost a week and a half just to make sure 'everything was square.'" Filing 13 at 6 (internal citation omitted). Crucially, Mark N. was not fired from his job because of memory issues. *See* Filing 9-2 at 61 (AR 60). In fact, he recalled that everything at work "turned out to be fine, that they were intending to hire me. . . but they had decided to let me go because I had requested a day off for my mother's wedding. . . . and the day that I had a seizure it counted against me." Filing 9-2 at 61 (AR 60). This information, combined with Mark N.'s history of seizure complications after neglecting to take his Keppra, supports the ALJ's decision. *See* Filing 9-2 at 24 (AR 23).

The ALJ noted, "In July 2024, the claimant's seizure disorder [was] described as stable." Filing 9-2 at 24 (AR 23). Mark N. seems to do reasonably well when taking his medication, avoiding seizures and the potential memory loss that comes with the seizures. Because the record demonstrates Mark N.'s seizures are generally controlled when he takes his prescribed Keppra, other assessments, which do not include Dr. Uselding's limitation, were favored by the ALJ. All medical opinions presented to the ALJ are considered in light of the record as a whole and an ALJ must "give good reasons . . . for the weight [they] giv. . . . treating source's medical opinion[s]." 20 C.F.R. § 404.1527(c)(2). The ALJ offered ample evidence demonstrating that Mark N. is generally stable while on Keppra. *See* Filing 9-2 at 24 (AR 23); Filing 9-2 at 22 (AR 21). Therefore, the ALJ properly acted by discounting the recommendation of Dr. Uselding and by adding a limitation consistent with the record as a whole. Because this Court's role does not include

"reweigh[ing] the evidence presented to the ALJ," the determination of the ALJ is proper. *Dols*, 931 F.3d at 746 (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)).

Mark N.'s concern with the ALJ not adopting Dr. Newman's belief that Mark N. can "adapt to changes, which are predictable and introduced gradually," is similarly unpersuasive. Filing 13 at 9 (internal citation omitted). The ALJ adequately addressed this limitation in the RFC even though the ALJ did not formulate the limitation in the precise terms that Dr. Newman used by stating that Mark N. "can respond appropriately to routine changes in the workplace." Filing 9-2 at 21 (AR 20).

The ALJ discounted Dr. Ihle's findings because the "opinion involve[d] conclusions without much support. Further, the consultative exam did not include adequate explanations as to why the evidence indicated specific limitations that are or are not necessary. Furthermore, this opinion is not supported by Dr. Ihle's explanation that the claimant's mental health is not debilitating." Filing 9-2 at 26 (AR 25). Mark N. argues that "the fact that Dr. Ihle, who was not a VE, opined that [Mark N.'s] mental impairments were not 'debilitating' did not mean that the limitations she identified did not need be to be included in the RFC or at least evaluated by the ALJ." Filing 13 at 10-11.

Contrary to Mark N.'s contention, Dr. Ihle's findings were clearly evaluated by the ALJ, and the ALJ was able to discount the opinion of Dr. Ihle and reject any inconsistencies it contained. *See Finch*, 547 F.3d; *Rogers*, 118 F.3d. As the Commissioner mentions, "[T]he ALJ is not required to explicitly. . . reconcile every conflicting shred of medical evidence." Filing 21 at 8 (quoting *Austin*, 52 F.4th at 729 (internal citation and quotation marks omitted)). Even if the ALJ was required to reconcile all conflicting medical evidence, the opinion of Dr. Ihle is largely based on the subjective comments of Mark N. For example, Dr. Ihle wrote that Mark N. stated, '"Living in

my situation, I randomly explode with anger,'" and then later she repeated his assertion, writing that "[Mark N.] randomly explodes with anger, due to the frustration of his physical situation and not being able to get a psychiatrist to see him," but she also noted that Mark N. "has not been in counseling, but he thinks it would be helpful to him. He stated that he has tried to get in to see a psychiatrist or psychologist, but has not been able to; the reason for that was unclear." Filing 10-1 at 519-20 (AR 859-60). The ALJ properly concluded Dr. Ihle's "opinion involve[d] conclusions without much support." Filing 9-2 at 26 (AR 25).

For the stated reasons, the Court finds that where the ALJ rejected limitations in the medical opinions he deemed persuasive, he adequately accounted for the excluded limitations in creating and explaining Mark N.'s RFC. Therefore, the Court rejects this ground for reversing the Commissioner's decision.

*2. The Commissioner Did Not Rely Upon EM-21065 REV to Prohibit any Consideration of Certain Parts of the DOT Such as Reasoning Level*

Mark N. claims that the "SSA cannot rely upon EM-21065-REV to completely prohibit any consideration of certain parts of the DOT such as reasoning level." Filing 13 at 1. Defendant is correct that "the Commissioner does not 'rely upon EM-21065 REV [or anything else] to completely prohibit any consideration of reasoning level.'" Filing 21 at 7 (internal citation omitted). Accordingly, this Court adopts Defendant's recommendation that "the Court should dismiss Plaintiff's preemptive argument on the subject." Filing 21 at 7 (internal citation omitted). The Court rejects this ground for reversing the Commissioner's decision.

*3. The ALJ Adequately Accounted for Moderate Limitations in Concentration, Persistence or Maintaining Pace*

Mark N. last argues that "remand is required where the ALJ's residual functional capacity (RFC) finding is inconsistent with his own finding of severe mental impairments causing moderate

limitations in concentration, persistence, or pace." Filing 13 at 1. Specifically, he argues, "it is beyond any question whatsoever that [Mark N.]'s admittedly severe mental impairments meant that his ability to perform the basic work activities necessary for unskilled work was significantly limited." Filing 13 at 21. Mark N. contends that "the ALJ explicitly found that [Mark N.] was capable of concentrating, persisting, and maintaining pace to perform all simple tasks. This alone shows an unacceptable contradiction between the ALJ's PRT [psychiatric review technique] and severity findings and his RFC finding." Filing 13 at 21; Filing 9-2 at 20-21 (AR 19-20).

At step three, the ALJ determined that Mark N. "has the following severe impairments: degenerative joint disease of the bilateral shoulders with residuals of surgery; residuals of tibia fracture surgery; epilepsy; anxiety disorder; and depressive disorder." Filing 9-2 at 19 (AR 18) (internal citations omitted). The ALJ determined that "[w]ith regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation." Filing 9-2 at 20 (AR 19). The ALJ's RFC is consistent with the moderate rating and supported by substantial evidence. As Defendant noted,

> [F]or purposes of evaluating a claimant's mental impairments, a "moderate limitation" means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpart P, Appendix 1 § 12.00F(2)(c). This is compatible with the ability [to] perform simple tasks, respond appropriately to routine changes, and occasionally interact with others as in the RFC.

Filing 21 at 10 (internal citation omitted). The ALJ's RFC was supported by substantial evidence, including reports from the state agency medical consultants at the initial level mentioning that "attention, concentration, and pace vary but are adequate for simple routine tasks not requiring sustained attention." Filing 9-2 at 27 (AR 26).

Accordingly, the ALJ's RFC finding is consistent with his own finding of severe mental impairments causing moderate limitations in concentration, persistence, or pace. As a result, the Court rejects this ground for reversing the Commissioner's decision.

## III. CONCLUSION

The Court concludes that substantial evidence supports the ALJ's decision that Mark N. is not disabled. Accordingly,

IT IS ORDERED that

1. Mark N.'s Motion for an Order Reversing the Commissioner's Decision, Filing 12, is denied;

2. Bisignano's Motion to Affirm the Commissioner's Decision, Filing 20, is granted;

3. The Commissioner's decision is affirmed; and

4. The Court will enter a separate judgment.

Dated this 13th day of August, 2026.

BY THE COURT:

Brian C. Buescher
Chief United States District Judge